UNITED STATES of America,
Plaintiff,

v.

FUNDS IN THE AMOUNT OF ONE
HUNDRED THOUSAND AND ONE
HUNDRED TWENTY DOLLARS
($100,120.00), Defendant,

Nicholas Marrocco and Vincent
Fallon, Claimants.

No. 03 C 3644

United States District Court,
N.D. Illinois, Eastern Division.

Signed February 11, 2015

Order Denying Reconsideration
July 27, 2015

Daniel Edward May, Craig Arthur Oswald, James Michael Kuhn, United States Attorney's Office, Chicago, IL, for Plaintiff.

Stephen M. Komie, Brian Elliott King, Komie & Associates, Chicago, IL, Terry O'Donnell, Law Offices of Terry O'Donnell, Addison, IL, for Claimants.

## ORDER

John J. Tharp, Jr., United States District Judge

For the reasons set forth in the Statement below, Claimants' Motion for a *Daubert* Hearing [240] is denied as moot; Claimants' Motion in Limine to Exclude Evidence Pursuant to Rule 403 or Due to Spoliation [242] is denied; Claimants' Motion to Suppress Statements [244] is granted; the United States' Motion to Strike Expert Witnesses [246] is granted in part and denied in part; and the United States' Motion for Production of Tax Returns [248] is denied. A status hearing in this matter is set for February 25, 2015, at 9:30 a.m.

## STATEMENT

On October 4, 2011, Judge Bucklo (who was then presiding in this case) granted summary judgment to the United States on its claim for forfeiture of $100,120 in currency seized from Vincent Fallon (one of the claimants in this case) on December 6, 2002, at Union Station in Chicago. *See* Summary Judgment Opinion, Dkt. 219. The currency was seized after, among other events, a drug-detection dog (named "Deny") alerted to a briefcase containing the currency. The details of the alert, and other facts relating to the seizure and the forfeiture claim, will be discussed below only to the extent necessary to resolve the present disputes.

In an opinion issued on September 19, 2013, the Seventh Circuit reversed the grant of summary judgment. *United States v. Funds in the Amount of One Hundred Thousand One Hundred & Twenty Dollars (Funds II)*, 730 F.3d 711 (7th Cir.2013).[1] The Seventh Circuit reversed on two grounds. For the first, which is relevant here only to the government's motion for production of tax returns, the Seventh Circuit held that there is a dispute of material fact as to whether the seized funds had a legitimate source; Nicholas Marrocco (the other claimant in this case) had stated, in his deposition testimony and in an affidavit supporting his opposition to summary judgment, that the funds came from savings he had accumulated over the course of the 10–12 years before the seizure. The second ground for reversal was the Seventh Circuit's holding that expert evidence submitted by the claimants, if admissible, creates material issues of fact as to whether the seized funds had recently been in contact with illegal drugs at the time of the seizure.[2] More specifically, the *Funds II* panel held that the proffered expert evidence raises material fact issues as to (1) "[whether] drug-dog alerts to currency are in general (and, *a fortiori*, Deny's alert in particular) reliable evidence that the currency recently has been in contact with illegal drugs," 730 F.3d at 721, and (2) "whether Deny's training was adequate," *id.* at 725.

The Seventh Circuit issued its remand mandate on November 12, 2013. Mandate Notice, Dkt. 234. Seven months later, a period during which there was no discernable activity, this case was reassigned to this Court's docket on June 13, 2014. At a status hearing on August 5, 2014, the Court set a deadline of November 5, 2014, for the filing of pretrial motions, including *Daubert* motions and any other substantive motions. The parties filed a series of motions by that deadline. First, the claimants challenge the admissibility of evidence they expect the government to introduce relating to the dog alert on the seized currency (Dkt.240). The claimants have also moved to bar that evidence as unduly prejudicial under Rule 403 or as a spoliation sanction based on the government's failure to preserve the seized currency, or in the alternative for a spoliation instruction (Dkt.242). In addition, the claimants seek to suppress statements Fallon made to law enforcement agents after they had seized the briefcase containing the funds and taken it to an office in the Amtrak station (Dkt.244). For its part, the United States has moved to strike two experts on issues relating to drug-dog alerts who have only recently been disclosed by the claimants (Dkt.246) and for the production of Marrocco's federal income tax information for the years 1991 through 1998 (Dkt.248).

### 1. Claimants' Challenges to the Dog–Alert Evidence (Dkts. 240 and 242)

The claimants' motions relating to drug-dog alerts arise from the fact that the government intends to "present evidence, through the testimony of the dog handler,

---

**1.** This opinion was the Seventh Circuit's second ruling in this case. The first ruling reversed an order by Judge Bucklo suppressing the government's search of the briefcase in which the funds were located when seized. *United States v. Marrocco (Funds I)*, 578 F.3d 627 (7th Cir.2009). That ruling is not directly at issue here, but has some relevance to one of the pending motions; to avoid potential confusion, that ruling will be referred to herein (and in any further opinions of this Court) as *"Funds I"* and the Seventh Circuit's more recent opinion will be referred to as *"Funds II."*

**2.** Without establishing such a connection, the government would not have a basis to argue that the funds were used to commit or facilitate a drug trafficking offense, as required to obtain forfeiture under 18 U.S.C. § 983(c)(1) and 21 U.S.C. § 881(a)(6).

and documents, about the dog's training, certification, history, past performance, reliability, and the alert to the money in this case." Govt. Resp., Dkt. 251, at 3. The government's position, in short, is that Deny was adequately trained to alert to the presence of various illegal drugs and that his alert on the briefcase is therefore reliable evidence that the currency was connected to drug trafficking activity.

As discussed in the Seventh Circuit's *Funds II* opinion, the claimants challenge the probative value of the dog-alert evidence by invoking the "currency contamination theory." *Funds II*, 730 F.3d at 719–22. That theory posits that most paper currency in circulation in the United States is contaminated with trace quantities of illegal drugs, most often, cocaine.[3] If drug-contaminated currency is ubiquitous, as the theory posits, then an alert on the currency offers no probative value to establish that the currency was recently connected to drug trafficking. The claimants have offered expert evidence to support the currency contamination theory, evidence which the Seventh Circuit held in its opinion is sufficient to create a fact issue—if the evidence is admissible. *Id.* at 721 n. 13.

In their current *Daubert* motion (Dkt.240) and motion in limine (Dkt.242), the claimants continue their attack on the evidence of the drug-dog alert.

### A. Claimants' *Daubert* Motion

The claimants seek to bar evidence of the so-called "Furton theory" to rebut the currency contamination theory. Dkt. 240, ¶¶ 11, 25, 27–28. In their *Daubert* motion, they assert that Deny's handler, Officer Richard King, is not competent to offer

opinion testimony as to what the dog was alerting to (*i.e.*, the presence of illegal drugs or something else), both because the dog's training does not provide an adequate basis to support that inference and because King is not "an expert in canine olfaction, scientific statistical analysis, or the chemical composition of any illegal narcotics allegedly contaminating the briefcase." *Id.* ¶ 23. The claimants assert, therefore, that no evidence of the dog's alert should be admitted at all.

In response, the government first asserts that the claimants' motion for a *Daubert* hearing is barred by the "law of the case" doctrine because Judge Bucklo previously denied a substantially similar motion. *See* Govt. Resp., Dkt. 251, at 3–4. That much is true: on May 27, 2010, Judge Bucklo, relying on the Seventh Circuit's opinion in *United States v. $30,670*, 403 F.3d 448 (7th Cir.2005), held that "the government is not obligated to reinvent the wheel by proving ... that the practice of using dogs to ferret out currency recently in contact with drugs is generally accepted." May 27 Order, Dkt. 166, at 1. Although this language harkens back to the long-discarded *Frye* test of whether an expert theory is "generally accepted," *see Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), the Court interprets the ruling to mean that Judge Bucklo concluded that the scientific reliability of drug-dog alerts to currency had been conclusively accepted in *$30,670* and other cases in which such evidence had been found to have probative value.

Nevertheless, the government's "law of the case" argument is wrong–profoundly and disturbingly so. In *Funds II* the Sev-

---

**3.** Dr. Warren James Woodford, one of the claimants' proffered experts, has conducted and cited research showing that "90% of U.S. Currency in general circulation contains cocaine." Woodford Report, Dkt. 242–5, ¶¶ 5–7. Another of the claimants' proffered experts, Dr. Lawrence Myers, cited research indicating "that general circulation currency is [also] contaminated with other narcotics, such as amphetamine, methamphetamine, heroin, and PCP." Myers Affidavit, Dkt. 242–3, ¶ 17.

enth Circuit expressly *rejected* Judge Bucklo's (and the government's) reading of *$30,670*. The *Funds II* panel explained that the holding in *$30,670* was based solely on "the empirical information presented in that case" and expressly rejected Judge Bucklo's conclusion that "*$30,670* precluded Marrocco from offering expert evidence attacking the reliability of drug-dog alerts to currency in general." *Funds II*, 730 F.3d at 720, 721 n. 13. The government's argument that there can be no generalized challenge to the probative value of a dog's alert is squarely foreclosed by the Seventh Circuit's opinion remanding the case to this Court.

In reversing the grant of summary judgment for the government, moreover, the Seventh Circuit also made clear that the proper procedure for mounting such a challenge to the reliability of drug-dog alerts to currency is by means of a *Daubert* hearing, noting that "[n]othing in *$30,670* precludes [a claimant] from offering expert evidence ... challenging the conclusion that drug-dog alerts to currency are probative of whether 'the most recent holder of the currency was involved with illegal narcotics activity.'" *Funds II*, 730 F.3d at 720 (quoting *$30,670*, 403 F.3d at 456). The Seventh Circuit further stated that "on remand the district court can resolve whether Marrocco's expert evidence and the government's expert evidence ... are admissible under *Daubert* and Rule 702." *Id.* at 721 n. 13. Notwithstanding this clear instruction that the competing expert evidence offered by the parties as to the probative value of a drug dog's alert should be resolved by means of *Daubert* challenges, the government nev-

ertheless maintains that a *Daubert* hearing is the "wrong procedural vehicle" to challenge a canine's reliability.[4] Govt. Resp., Dkt. 251, at 4.

The government invokes the Supreme Court's opinion in *Florida v. Harris*, —— U.S. ——, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013), to support its argument that "the science behind the admissibility of dog sniff evidence has been found reliable," Govt. Resp., Dkt. 251, at 6, but its reliance on *Harris*—which did not involve a dog alert to currency—is misplaced. In *Harris*, the Court found that an alert by an adequately trained dog, unrebutted by opposing evidence, can support a finding of probable cause. But the Court expressly held that those opposing introduction of evidence of a drug-dog alert "must have an opportunity to challenge ... evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing [their] own fact or expert witnesses." 133 S.Ct. at 1057. The Court therefore plainly contemplated expert challenges to the reliability of dog alerts and, moreover, said nothing that can be read to preclude any sort of challenge to the scientific reliability of dog-alert evidence generally, or to dog alerts to currency specifically. The Court was not presented with, and did not consider, any scientific evidence relating to a dog's ability to detect cocaine and did not limit its confirmation of the right to challenge the reliability of a dog's alert in any way. The government's contention that *Harris* precludes such challenges is particularly untenable given the fact that *Funds II*—which plainly permits such challenges—came out after, thoroughly dis-

---

4. The government's misreading of *Funds II* is also evident in its statement that the Seventh Circuit "remanded to permit claimants to challenge the drug sniff evidence *at trial*." Govt. Resp., Dkt. 252, at 7 (emphasis added). Contrary to the implication of the government's statement, the Seventh Circuit did not affirm that the evidence of either party was admissible (such that it could be used "at trial"); rather, the Seventh Circuit expressly stated that the evidence of both parties should be evaluated under *Daubert* and Rule 702 to determine whether it is admissible.

cussed, and relied on *Harris* in reversing the grant of summary judgment in the government's favor. *see Funds II,* 730 F.3d at 724.

This Court is at a loss to understand how, in light of the Seventh Circuit's opinion and remand, the United States could maintain that "law of the case" bars the claimants' objections and request for a *Daubert* hearing. Its insistence on spitting into the wind, moreover, has substantially damaged its case. Because the government has continued to maintain that the general reliability of dog-sniff evidence cannot be challenged, it has not bothered to challenge the admissibility of the expert evidence that the claimants offered in opposition to the summary judgment motion—even though the Seventh Circuit expressly conditioned its ruling that the evidence created a material dispute of fact on whether that evidence is admissible under *Daubert* and Rule 702. That determination had not been made in this case—until now. Having failed to contest the expert evidence previously offered by the claimants—specifically, the opinion testimony of Sanford Angelos, Dr. Lawrence Myers, and David Kroyer—the United States has forfeited any objection to the admissibility of that evidence under Rule 702.

The government has similarly forfeited the opportunity to offer evidence to establish that "the science behind the admissibility of dog sniff evidence" is sound. The claimants seek to bar introduction by the government of any evidence of the so-called "Furton theory" to rebut the claimants' "currency contamination theory." As the *Funds II* panel explained, in *$30,670*:

> the government cited research by Dr. [Kenneth] Furton and others that concluded that drug dogs do not sniff cocaine *per se,* but rather methyl benzoate (a byproduct of cocaine undergoing hydrolysis due to the presence of moisture

in the air). Dr. Furton stated that methyl benzoate evaporates quickly from the surface of currency, and consequently that currency exposed to cocaine could only be detected by a drug dog shortly after exposure. Thus, Dr. Furton concluded that drug-dog alerts to currency are generally probative evidence that the currency recently was in contact with cocaine.

730 F.3d at 719 (citations omitted). The Seventh Circuit has expressly confirmed that a *Daubert* challenge to "the government's evidence (that is, Dr. Furton's research)" is permissible. *Id.* at 721 n. 13 But so far as the Court can see, the government has never actually offered any expert evidence concerning Dr. Furton's theory in this case. Rather, as the Seventh Circuit's opinion reflects, it is only "[*t* ]*hrough its reliance upon $30,670* " that the government has advanced Dr. Furton's research, *id.* at 721 (emphasis added), and even in *$30,670*, Dr. Furton's research was at issue not because the government presented it in the trial court but because on appeal the Seventh Circuit invited the parties to submit additional briefs on the question of "the probity of dog alerts to currency," 403 F.3d at 453–54. Based solely on the "publicly available empirical information" about dog alerts to currency that the parties subsequently presented, the appellate panel in *$30,670* found that "dog alerts to currency should be entitled to probative weight." *Id.* at 454, 460. In this case, however, the Seventh Circuit has expressly held that the claimants' evidence "raises questions about the scientific validity of [a] finding that drug dogs only alert to methyl benzoate" and is sufficient, if admissible, to create a fact issue as to the reliability of the dog-alert evidence in this case (and more generally). *Funds II,* 730 F.3d at 721.

Thus, although the Seventh Circuit's opinion in this case plainly anticipated

evaluation of the Furton theory on remand, the government has never offered any evidence in support of that theory. There is, therefore, nothing to evaluate. The government's failure to offer any expert testimony in support of the theory *before* remand might be explained, in part, by the Seventh Circuit's use of publicly available information (rather than expert opinion evidence developed in the trial court) to support its appellate findings in *$30,670* concerning the reliability of dog-alert evidence. Based on those findings, Judge Bucklo concluded that there was no need for the government to introduce expert evidence to establish the scientific reliability of a drug-dog alert. *See* May 27 Order, Dkt. 166, at 1 (citing *$30,670* and concluding that "the government is not obligated to reinvent the wheel by proving, in each case in which it seeks to introduce the results of a dog sniff, that the practice of using dogs to ferret out currency recently in contact with drugs is generally accepted"). Accordingly, the government introduced none.

Whatever the propriety of the appellate fact finding conducted in *$30,670*, nothing in that opinion (or any other, to this Court's knowledge) authorizes a party to present expert opinion testimony by reference to publicly available materials in lieu of the testimony of an expert qualified to offer opinion testimony under the requirements of Rule 702 and *Daubert*. And in any event, none of this explains the government's failure to offer any further expert evidence of its own *after* the remand in this case, or even to request an opportunity to do so, when the Seventh Circuit explicitly rejected Judge Bucklo's reasoning and held that this Court can consider and resolve challenges to expert testimony

from both parties as to the general probative value of drug-dog alerts to currency. Rather than fight the battle that is required by the Seventh Circuit's rationale in *Funds II*, the government has steadfastly insisted that it need only rely on evidence of the drug dog's performance in training. Having neither disclosed expert evidence following remand, nor requested an opportunity to do so, the government has forfeited that opportunity. There is, accordingly, no need for a *Daubert* hearing as to "the government's expert evidence" on the Furton theory: there is no such evidence.

■ Taking the proposition that dog-alert evidence is reliable as a given (based on its obstinately erroneous reading of *$30,670* and misplaced reliance on *Harris*), the government intends to rely solely on the testimony of Officer King and documentation of Deny's training to establish the probative value of Deny's alert to the currency seized in this case. King will describe "the dog's training, certification, history, past performance, reliability, and the alert to the money in this case." Govt. Resp., Dkt. 251, at 3. Thus, the government responds to the claimants' objections to the admissibility of testimony from King by contending that he has not offered any opinion testimony. Govt. Resp., Dkt. 251, at 6–7 (explaining that King will not offer "scientific" knowledge and that his testimony will be based on his personal observation of Deny's training performance).[5]

■ That assertion is largely, but not entirely, correct. The mistake the government makes is assuming that all of King's testimony about Deny's performance qualifies as non-expert testimony. While much of the testimony in the affidavits King has

---

**5.** *Daubert* challenges, of course, are not limited to "scientific" testimony. *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (explaining that *Daubert* and Rule 702 apply to all specialized knowledge, not just "scientific" knowledge).

offered relates to the dog's past performance on tests and in the field and is therefore fact rather opinion testimony,[6] some of it—principally his statements to the effect that "Deny was trained to alert to the presence of the odor of illegal drugs" and "Deny's actions indicated a positive alert for the presence of the odor of illegal drugs," June 24 King Affidavit, Dkt. 240–1, ¶¶ 7, 21—plainly constitutes opinion evidence about the identity of the chemical substance to which the dog was alerting; this type of testimony rests on conclusions about how and what dogs smell, and how they react to known odors, that are beyond the ken of lay witnesses. That opinion testimony is, as *Funds II* confirms, properly the subject of a *Daubert* challenge. The claimants' lead motion (Dkt.240), timely filed in accordance with the schedule entered by this Court, makes that challenge, and the government has done nothing in response to establish that King is competent to offer those opinions, relying instead on its utterly untenable view, rejected by the Seventh Circuit in *Funds II*, that *$30,670* forecloses any challenge to the probative value of a drug dog's alert to currency. Officer King will therefore be precluded from offering any opinion as to what substance Deny was alerting to, whether in training exercises or in the field. Accordingly, no *Daubert* hearing is required with respect to his testimony, and the claimants' motion for a *Daubert* hearing is denied as moot.

### B. Claimants' Motion in Limine

The claimants' motion in limine seeks to bar the admission of any evidence concerning Deny's alert on the funds. Although King will be precluded from offering opinion testimony about the alert because he has not been established as an expert witness, the Court will permit the introduction of King's non-expert testimony on this subject (and other relevant subjects). Non-expert testimony, by definition, is not subject to Rule 702; its admissibility is determined by its relevance and potential for unfair prejudice under Rules 401 and 403, respectively.

■ The claimants' primary argument in their motion in limine is that Deny's alert was "so unreliable, that even if relevant, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Dkt. 242, ¶ 39. Evidence that Deny located the seized currency is plainly relevant to the question of whether the currency (or briefcase) had recently been in close connection with illegal drugs. The claimants do not seriously argue otherwise and it would be difficult to do so in view of the Supreme Court's holding in *Harris* that a dog alert has some probative value "even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." 133 S.Ct. at 1057.[7] That is also why, in

---

6. For example, the affidavits indicate that "Deny never failed to find [the] hidden drugs" during training exercises, June 24 King Affidavit, Dkt. 240–1, ¶ 8, and list specific dates on which Deny alerted to hidden currency that had purposefully been exposed to drugs, Nov. 4 King Affidavit, Dkt. 240–2, ¶ 7.

7. To say that an alert by a dog that satisfies this criterion has some probative value does not, however, suggest that it has sufficient probative value to carry the day. *Harris*, of course, addressed the reliability of dog-alert evidence in the context of a probable cause

hearing. Probable cause, however, is a lesser standard of proof than the government is required to meet under the Civil Asset Forfeiture Reform Act, which requires that the government demonstrate by a preponderance of the evidence that the property at issue is subject to forfeiture. *See* 18 U.S.C. § 983(c)(1); *see also $30,670*, 403 F.3d at 454 & n.4; *United States v. 5 S 351 Tuthill Rd.*, 233 F.3d 1017, 1023 (7th Cir.2000), *amended on denial of reh'g* (Mar. 21, 2001). *Harris* does not suggest that the government's reliance on an alert by a drug dog whose training

reversing the grant of summary judgment for the government in this case, the Seventh Circuit cited both the claimants' evidence of inadequate training, and King's testimony about Deny's training, as evidence relevant to the disputed fact question of the dog's reliability. *See, e.g., Funds II,* 730 F.3d at 724 (citing King's testimony that Deny was proofed off of untainted currency).

Instead, the claimants purport to challenge the admissibility of evidence concerning Deny's training and performance under Rule 403. The gist of their Rule 403 challenge appears to be that there are so many deficiencies with Deny's training that the probative value of the alert is minimal and is therefore "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Dkt. 242, ¶ 39. The claimants do not, however, explain how or why evidence of the dog's alert would mislead jurors, particularly in light of the unrebutted expert testimony that the claimants will be able to marshal to highlight deficiencies in Deny's training. In essence, the claimants' Rule 403 argument is really an argument for judgment as a matter of law, asserting that the government's evidence is so wanting that no reasonable juror could conclude that the dog's alert was reliable. In *Funds II,* however, the Seventh Circuit has already held that the adequacy of Deny's training presents a material fact dispute that must be resolved by the jury. Accordingly, the motion to exclude evidence of Deny's alert on this basis is denied.

The claimants' alternative argument in their motion in limine is that evidence of Deny's alert should be barred as a sanction for the government's failure to preserve the seized currency. Rather than preserve those notes, the government deposited the funds with a bank. The claimants contend that by depositing the funds, the government intentionally destroyed critical evidence in the case and prevented the claimants from conducting their own testing of the currency. As a result, they contend, the Court should bar "the introduction of the dog sniff and currency evidence" as a spoliation sanction. Dkt. 242, ¶ 56. Alternatively, the claimants seek a jury instruction regarding spoliation (though they did not actually propose one). *Id.* ¶ 57.

The government responds to the spoliation claim by relying again on "law of the case." Here, at least, the argument has a basis in fact. The claimants previously presented a spoliation motion to Judge Bucklo, who denied it in a ruling that is not directly implicated by the Seventh Circuit's opinion in *Funds II. See* May 27 Order, Dkt. 166, at 1–2. Judge Bucklo concluded that the spoliation argument was "without merit" because the government had not acted in "bad faith" by depositing the currency into a bank account "pursuant to Department of Justice policy" and the currency itself had no evidentiary value. *Id.* Nevertheless, this Court has substantial questions about both grounds of the prior ruling.

■ As to the first, the government's response to the motion states that it is "department policy that cash is generally not to be retained by an agency." Govt. Resp., Dkt. 252, at 12–13. The response does not identify any such "general" policy, however, nor does it describe the exceptions to that "general" policy. Further, if the policy requires the deposit into a bank account of physical currency that has evidentiary value apart from its amount,

---

has not been challenged, standing alone, satisfies the more demanding preponderance of the evidence standard. Indeed, it does not

hold even that an alert *necessarily* satisfies probable cause even when the adequacy of the dog's training has not been challenged.

the government has not provided any rationale that would justify such a policy. It makes sense, of course, for money to earn interest rather than sitting in the form of bundles of cash in an evidence vault, but the government's interest in earning interest on cash, before its lawful ownership of that cash has even been established, 'does not justify the destruction of evidence that has, or may have, significant probative value.[8] The existence of a statutorily-established seized assets fund does not mandate, or even support, the government's action in failing to preserve the currency; the statute in no way suggests that currency with evidentiary value should be deposited into the Treasury. *See* 28 U.S.C. § 524(c). To the contrary, Department of Justice policy has recognized that the fund is " 'a holding account for *non-evidentiary* cash.' " *United States v. $277,000,* 69 F.3d 1491, 1494 (9th Cir.1995) (emphasis added). In short, the government has produced no evidence of any policy of the Department of Justice that requires, or advises, that currency with evidentiary value should be deposited in banks rather than be preserved as evidence, and it is difficult to imagine that the department in fact has a policy of destroying probative evidence.

And to the extent that Judge Bucklo accepted the government's argument that the currency seized in this case had no independent evidentiary value, this Court respectfully, but adamantly, disagrees. The forfeiture claim in this case largely turns on whether the currency was contaminated with illegal drugs; absent such contamination, there is not an adequate evidentiary basis to link the currency to drug trafficking. The government seeks to rely exclusively on the drug-dog alert to establish that connection, but the best evidence as to whether the currency was contaminated with illegal drugs would be derived from testing the currency itself—testing that was never done and now cannot be done because the government intentionally failed to preserve the currency. As the Seventh Circuit observed in *Funds II,* "[b]y failing to perform such testing (and failing to preserve the Funds until the conclusion of this proceeding), the government eliminated laboratory testing as a source of evidence." 730 F.3d at 720 n.9. And in eliminating the possibility of laboratory testing, the government deprived the claimants of the ability to discover whether the currency was actually contaminated by any drugs.[9]

The government apparently maintains that Deny alerted to methyl benzoate evaporating from the currency (though, as discussed above, it has not produced any evidence in support of that theory) and that because that evaporation proceeds quickly, preserving the currency was unnecessary because the evaporation process ended before any testing could be done. But that only means that testing could not have proved the *government's* theory. It says nothing about whether testing could have supported the *claimants'* theory (either affirmatively or by undermining the government's theory). Had the currency been tested and found to contain drug contaminants at levels typically found on

---

8. It is worth noting that over the course of this law suit, which is now in its twelfth year, the value of the time and resources the government has expended undoubtedly dwarfs the amount of interest it earned on its deposit of the seized funds over the period that would have been necessary to permit the funds to be tested.

9. The Court also notes that Dr. Woodford, one of the claimants' proffered experts, has opined that "the only manner in which to verify the probative value of Deny's purported alert would have been to conduct a detailed crime laboratory analysis of the actual currency seized to precisely quantify the amount of methyl benzoate it was emitting." Woodford Report, Dkt. 2425, ¶ 22.

circulated U.S. currency, the claimants would have had support for their "contaminated currency" argument; if the currency proved to be contaminated by a drug other than cocaine, the irrelevance of the Furton theory would have been confirmed;[10] if it revealed that there was no drug contamination on the notes, the claimants' contention that the dog alerted to something else entirely (e.g., the ink on the notes, other contaminants on the notes or on the briefcase, or cueing by one or more officers) would have been strengthened. Other forms of testing might have been pursued as well. The claimants, for example, could have sought to conduct another controlled test of Deny's ability to detect the seized currency; if the dog detected the currency some months after it was seized, their argument that the dog originally alerted to something other than methyl benzoate would have been strengthened. Any of

these results could have damaged the government's forfeiture claim.[11]

The government opposes the imposition of a spoliation sanction by arguing that under Seventh Circuit law, spoliation cannot be inferred absent a finding of bad faith—meaning that the evidence was intentionally destroyed to prevent its discovery by the opposing party. That point is debatable,[12] but in any event the premise that the government did not act in bad faith here is not self-evident. As noted above, there is no evidence whatsoever of a government policy that justifies the government's course of conduct. And as for the contention that the government did not intend to deprive the claimants of potentially probative evidence, the claimants point out that if the briefcase had contained actual drugs, rather than (allegedly) drug-tainted currency, the government would never have relied on Deny's alert to establish that the substance found in the

10. As noted, the Furton theory applies only to currency contaminated with cocaine; its premise is that dogs do not detect cocaine itself but the methyl benzoate byproduct of cocaine hydrolysis that occurs when currency tainted with cocaine residue is exposed to moisture (humidity) in the air. If testing revealed that the currency was contaminated not by cocaine but rather than by some other illegal drug that the dog was trained to detect (King's affidavit avers that Deny was trained to detect not only cocaine, but also marijuana, heroin, ecstasy, and methamphetamine), the Furton theory, applicable only to currency contaminated with cocaine, would be irrelevant and unavailable. That the government has seemingly abandoned the theory at this stage of the litigation does not mean that invalidation of the theory early on would not have been helpful to the claimants.

11. It is of course speculative as to what the results of testing would have been, "[b]ut therein lies the prejudice—[the claimant] was denied any opportunity to find out one way or the other." Marrocco v. Gen. Motors Corp., 966 F.2d 220, 223 (7th Cir.1992) (rejecting the argument that prejudice was speculative because the defendant could not prove that examination of physical evidence would have

aided its cause); see also Oleksy v. Gen. Elec. Co., No. 06 C 1245, 2013 WL 3944174, at *9–10 (N.D.Ill. July 31, 2013) (applying Marrocco to impose sanctions against the defendant based on failure to preserve evidence).

12. Compare, e.g., United States v. Esposito, 771 F.2d 283, 286 (7th Cir.1985) (holding that a finding of bad faith is necessary to invoke the spoliation doctrine), with Marrocco, 966 F.2d at 224 (affirming the imposition of sanctions for negligent failure to preserve evidence and stating that "[t]here is no legal basis for [the] claim that sanctions should be limited solely to situations where the non-compliance is willful or deliberate"), and Oleksy, 2013 WL 3944174, at *9–10 (imposing sanctions for spoliation absent a finding of bad faith). And to the extent that it requires a showing of bad faith before any spoliation sanction can be imposed, the Seventh Circuit appears to be in the minority of circuit courts. see United Med. Supply Co. v. United States, 77 Fed.Cl. 257, 266–67 (2007) (discussing the "division of authority among the circuits on this issue" and noting that courts that require a showing of bad faith "represent[ ] a distinct minority").

briefcase was an illegal drug. Instead, the government would have preserved and tested the seized substance in order to identify it. The government's approach should have been no different here.[13] But it was, and one is left to wonder why the government proceeded differently here, if not to avoid the possibility that more probative examination of the currency in a laboratory might reveal evidence that would undermine the value of the dog's alert.

◼ Nevertheless, the Court is constrained to agree with the government's law-of-the-case response on this issue and, accordingly, must deny the motion to exclude evidence of Deny's alert as a spoliation sanction as well as the request for a spoliation instruction. Notwithstanding this Court's disagreement with Judge Bucklo's prior ruling denying the claimants' spoliation motion, that ruling remains the law of the case because the claimants did not appeal it. An appeal from a final judgment encompasses all rulings by the district court. See, e.g., Glass v. Dachel, 2 F.3d 733, 738 (7th Cir.1993) ("[W]hen the appellant appeals the final judgment, that judgment necessarily incorporates all earlier interlocutory decisions."); Chaka v. Lane, 894 F.2d 923, 925 (7th Cir.1990) ("[T]he single final judgment incorporates earlier interlocutory decisions...."). In failing to raise on appeal the ruling on their spoliation motion, the claimants forfeited any right to subsequently challenge that ruling. See, e.g., Hojnacki v. Klein–Acosta, 285 F.3d 544, 549 (7th Cir.2002) ("A party waives any argument that it does not raise before the district court or, if raised in the district court, it fails to develop on appeal."); United States v. One 1987 Mercedes Benz Roadster, 2 F.3d 241, 243 (7th Cir.1993) ("Because the [party

that lost the motion] decided not to prosecute the appeal, it has accepted the district court's opinion as the law of the case."). Were the Court writing on a clean slate, however, it would grant the claimants' motion and bar the admission of the dog-alert evidence in this case based on the government's failure to preserve the seized currency. In this Court's view, the failure to preserve the currency seized in this case evinces utter indifference to the rights of the claimants. The government had a duty to preserve evidence potentially relevant to its forfeiture claim and the currency unquestionably constitutes such evidence. It should have been preserved.

## 2. Government's Motion to Strike Previously Undisclosed Experts (Dkt.246)

As noted above, the claimants presented reports from three experts in opposing summary judgment: Sanford Angelos, a forensic chemist, David Kroyer, a certified drug-dog training and behavior consultant, and Dr. Lawrence Myers, a veterinarian and neurophysiologist. Although the government has not lodged any *Daubert* challenges as to these experts, it objects to the claimants' post-remand disclosure of two additional experts: Andre Falco Jimenez, a "certified canine specific odor detection trainer," and Dr. Warren James Woodford, a forensic chemist and licensed researcher "working in the field of odor science." Govt. Mem., Dkt. 247, at 4 (internal quotation marks omitted). The government maintains that the disclosure of these witnesses at this stage of the case is untimely and, alternatively, that the government should be given an adequate opportunity to locate and consult with potential rebuttal experts. The government also main-

---

**13.** If anything, the lack of visual evidence suggesting that the currency was connected to drug trafficking makes it more, rather than less, important to preserve and test the currency.

tains, with no evident sense of irony, that the opinions that they need additional time to rebut are cumulative of opinions already being offered by the claimants' previously disclosed experts—which the government has not sought to rebut.

Dr. Woodford's testimony will be permitted. Angelos, the forensic chemist that the claimants first disclosed, died in 2011. The claimants have retained Dr. Woodford to cover the ground that Angelos would have covered. Because Dr. Woodford's opinions are not simply duplicative of those previously offered by Angelos (as evidenced by Dr. Woodford's own, lengthy, report), however, the Court will afford the government an opportunity to depose Dr. Woodford. Further, to the extent that the government can demonstrate that Dr. Woodford's opinions extend materially beyond the scope of the opinions of Angelos, the government will be permitted an opportunity to offer a rebuttal expert.

Falco, however, will not be permitted to testify. The claimants effectively concede that the opinions of Kroyer and Falco are essentially duplicative when they acknowledge that they intend to call only one of these witnesses to testify at trial. Moreover, they make no case for changing horses in mid-stream, particularly since Kroyer is not subject to any *Daubert* challenge or rebuttal testimony, the government having failed to file any timely motion in that regard. Any such challenge was due by November 5, 2014.

### 3. Claimants' Motion to Suppress Fallon's Statements (Dkt.244)

The claimants also seek to suppress Fallon's statements following seizure of the briefcase he was carrying. Although neither side's briefs adequately explain the prior history of this issue, the Court gleans from its own review of the docket that in connection with her original ruling suppressing evidence of the discovery of the funds based on the warrantless opening of Fallon's briefcase, Judge Bucklo held that the government could not rely on any statements that Fallon made after the briefcase was seized and taken to the Amtrak office at Union Station because he was then in custody and had not been provided with *Miranda* warnings. *See* Evidentiary Opinion, Dkt. 52, at 10 n.1. The United States moved for reconsideration of the suppression order (Dkt.54), including the portion of the order suppressing Fallon's statements at the Amtrak station. *See* Govt. Mem., Dkt. 56, at 11–12. Judge Bucklo ultimately denied the motion to reconsider on September 21, 2006. Sept. 21 Order, Dkt. 86.

The government appealed the suppression of the funds, but did not appeal the suppression of Fallon's statements. In *Funds I*, the Seventh Circuit reversed the suppression of the seized funds. In the wake of that ruling, the claimants filed a motion in limine (Dkt.152) seeking confirmation that the prior ruling suppressing Fallon's statements was not implicated by the Seventh Circuit's opinion. On May 26, 2010, Judge Bucklo issued a docket entry denying the motion in limine regarding Fallon's statements and also denying two other pending motions by the claimants. May 26 Order, Dkt. 165. Subsequently, Judge Bucklo issued a detailed order regarding the claimants' motions which said nothing about Fallon's statements, *see* May 27 Order, Dkt. 166, as well as a docket entry correcting the May 26 Order to state that the motion to exclude Fallon's statements would be taken up with what was then the government's anticipated motion for summary judgment, *see* June 2 Order, Dkt. 167. In her ruling on the government's third summary judgment motion, Judge Bucklo cited and confirmed her original ruling suppressing Fallon's statements, thus implicitly granting the claimants' motion in limine regarding those

statements. *See* Summary Judgment Opinion, Dkt. 219, at 7 n.5.

Despite the fact that Judge Bucklo twice held that Fallon's statements should be suppressed, the government's response to the claimants' present suppression motion states flatly that "this motion was previously denied by Judge Bucklo" and argues again that the "law of the case" requires that the statements be admitted. Govt. Resp., Dkt. 253, at 2–3 ("Claimants' motion to exclude custodial statements has already been presented to the court in this case and denied. Under the law-of-the-case doctrine, it should remain denied."). The government's response reports only Judge Bucklo's initial denial of the claimants' motion in limine; it relates neither her order vacating that denial, nor her original decision granting the motion to suppress Fallon's statements at the station, nor her summary judgment order confirming that ruling. To state, in the light of this record, that Judge Bucklo *denied* the claimants' motion is an egregious misrepresentation of the record in this case—one that is even more clear-cut than the government's abject failure to acknowledge the premise of the Seventh Circuit's ruling in *Funds II,* which the Court has already discussed.[14]

Notwithstanding the government's mischaracterization of the record on this issue, this Court is constrained to conclude that the prior rulings suppressing Fallon's statements at the Amtrak station were incorrect since "the results of interrogation without *Miranda* warnings are admissible in civil cases." *Hanson v. Dane Cnty.,* 608 F.3d 335, 339 (7th Cir.2010) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 315, 96 S.Ct.

1551, 47 L.Ed.2d 810 (1976)); *see also, e.g., United States v. $107,840,* 784 F.Supp.2d 1109, 1118–19 (S.D.Iowa 2011) ("[C]ivil forfeitures conducted pursuant to 21 U.S.C. § 881 are considered civil cases for the purpose of the Fifth Amendment's Self-Incrimination Clause."). Nevertheless, what is sauce for the goose is sauce for the gander; just as the claimants forfeited their spoliation argument by not appealing Judge Bucklo's ruling on that issue, so too has the government forfeited its objection to the suppression of Fallon's statements at the Amtrak station office by failing to raise the suppression ruling on a cross-appeal from Judge Bucklo's summary judgment ruling. *See, e.g., United States v. Tello,* 687 F.3d 785, 799–800 (7th Cir. 2012) (failure to take cross-appeal waived argument); *United States v. Sutton,* 582 F.3d 781, 786 (7th Cir.2009) (same). Accordingly, Judge Bucklo's suppression ruling remains law of the case and will bar the government's introduction of Fallon's statements at the Amtrak station in its case-in-chief.

### 4. Government's Motion for Additional Tax Returns (Dkt.248)

Unfortunately, the government's mischaracterizations of the record in this case also infect its motion for additional tax returns. In that motion, the United States represents that until Marrocco submitted an affidavit in support of his opposition to the government's summary judgment motion in 2010, the government did not know that Marrocco claimed that he had earned the defendant funds over the course of his employment dating back to 1990. Dkt. 248, ¶¶ 8–11. The government maintains

---

**14.** Presumably, the claimants asserted their motion to suppress Fallon's statements yet again, post-*Funds II* remand, because they were not sure whether the reversal of the summary judgment ruling vitiated the suppression of those statements. As discussed further below, it did not. The claimants take appropriate umbrage at the government's mischaracterization of the record, so it is clear that they did not file the motion because they harbored any uncertainty about Judge Bucklo's prior rulings.

that Marrocco was required, but failed, to include information about the source of the funds in response to discovery requests the government tendered and that it was therefore unaware of his claim that the funds comprised savings from employment prior to 1999. *Id.* ¶¶ 2–6, 10. Consequently, the government asks the Court to order production of Marrocco's tax returns for the years 1991–1998.

The claimants' response demonstrates that both of the government's contentions—that Marrocco failed to respond adequately to discovery and that the government did not know that he claimed that the seized funds were the product of savings dating back to the early 1990s—are unfounded. With respect to discovery, the government is correct that Marrocco produced only his tax returns for the years 1999–2002. What the government's motion neglects to explain, however, is that those are the only years for which the government requested tax returns. *See* Govt. Interrogatories & Requests to Produce, Dkt. 255–1, at 10 (Request No. 1) (produce "personal federal income tax returns . . . for the tax years 1999, 2000, 2001, and 2002"). The government never asked Marrocco for tax returns from earlier years.[15]

As for the government's contention that Marrocco failed to include information about earnings before 1999 in response to an interrogatory that called for him to identify "each and every fact" upon which he based his denial that the source of the funds was drug trafficking, *see id.* at 5 (Interrogatory No. 5), it is less than pellu-

cid that this interrogatory required an identification of all income earned dating back to college. The ambiguity, moreover, is particularly acute in the context of the numerous other interrogatories that limited the government's requests for information to the years 1999–2002. *See, e.g., id.* (Interrogatory No. 6) (list employers since 1999); *id.* at 5–6 (Interrogatory No. 7) (list sources of income since 1999); *id.* at 6 (Interrogatory No. 8) (list bank accounts held since 1999); *id.* (Interrogatory No. 9) (identify real estate sold within past five years); *id.* at 7 (Interrogatory No. 10) (itemize expenses for the past three years); *id.* at 8 (Interrogatory No. 12) (list phone numbers since 1998); *id.* (Interrogatory No. 15) (list credit cards held since 1999). Plainly, the government's discovery focus was on the period between 1999 and the seizure of the defendant funds; in light of this focus, it is not surprising that Marrocco did not construe Interrogatory No. 5 to require a recitation of his income dating back to 1990, even if it could be read literally to encompass that information.

In any event, the record demonstrates that Marrocco advised the government on several occasions of his claim that the seized funds were the product of savings dating back to the early 1990s. The government deposed Marrocco in December 2003; during the course of that deposition, Marrocco told the government repeatedly that he had been saving cash since the early 1990s and that the seized funds had represented a substantial portion of those savings:

---

**15.** The Court notes as well that, when the government had the opportunity to question Marrocco directly about his tax returns, it limited its questioning to the years 1999 to 2002, asking no questions at all about tax returns from years before 1999:

Q: And we made a document request for some of your tax returns.
A: Mm-hmm.

Q: You provided us with your 1999s and your 2000s.
A: Yes.
Q: Do you have 2001 and 2002?
A: They have not been filed. [Followed by explanation.]

Marrocco Deposition, Dkt. 255–2, at 39:22–40:12.

Q: Where did the $100,120 come from?

A: From my salaries for past years. I've been saving the money since Day One. I don't have any bank accounts so I've always kept my money at home.

Marrocco Deposition, Dkt. 255–2, at 11:4–7.

Q: When did you start saving this money?

A: I would say I've had a shoe box for, since I was 17, .... I've been saving money for quite some time being that I had no bank account.

*Id.* at 12:24–13:5.

Q: Would it be—

A: I've been saving money for 10 to 12 years, at least, consistently

. . . .

*Id.* at 23:20–22. Indeed, Marrocco even provided the government information about his employment, salary, and expenses in years predating 1999:

Q: And 2002—

A: Four years back, all—actually, you know what? I think on the prior years from '99, '98, '97, '96, because I took that pay cut, I think I was making 48,000 and some odd dollars before. So I was making more and I took a pay cut to get the larger ownership at some point.

*Id.* at 43:6–11. Marrocco also claimed that he was able to accumulate so much cash because his expenses had always been extremely limited:

Q: Personal expenses.

A: ... I worked and I ate and I worked 95 hours a week, so for the last eight years I did that, and then before that I worked [a] full-time job and bar tended for a second job for the four years after college. So I had two jobs and one job where I worked 95 hours a week after-

wards. So my expenses are very limited.

*Id.* at 48:8–14.

In light of this testimony, the government's representation about its knowledge (*i.e.*, that it did not know, prior to 2010, that Marrocco was claiming that savings dating back to the early 1990s accounted for the seized funds) is indefensible—but it gets even worse. Marrocco's deposition was not the only time he made the claim that the funds were the product of years of employment savings. In April 2007, the claimants filed a motion to establish ownership in the funds (Dkt.100) and attached an affidavit in support in which Marrocco stated that the funds constituted "a portion of my savings from lawful employment over the course of my life." 2007 Marrocco Affidavit, Dkt. 100–3, ¶ 8. This is the very same statement that appears in the affidavit that Marrocco filed in opposition to the government's motion for summary judgment in 2010—the affidavit that the government says finally alerted them to Marrocco's claim that the seized funds had been part of cash savings accumulated over the course of his working life. *See* 2010 Marrocco Affidavit, Ex. B to Dkt. 248, ¶ 16.

Plainly, the government knew long before Marrocco's summary judgment opposition in 2010 that he claimed that the seized funds were part of his life savings. Its egregious misrepresentation of the record on this point is reason enough to deny the motion for the production of additional tax returns. But even if the premise were true, the Court would still deny the motion. If the government believed that Marrocco's 2010 affidavit was untimely, and that they required additional discovery to respond to it, the proper course would have been to seek additional discovery at that time, *see* Fed. R. Civ. P. 56(d)(2), which the government did not do. Nor did

the government seek additional discovery during the many months that this case sat idle following the Seventh Circuit's remand in *Funds II*. As noted above, the Seventh Circuit issued its remand mandate on November 12, 2013. Following that remand, the United States—which is the *plaintiff* in this case—did nothing at all to move the case forward for seven months, and did not seek additional discovery of Marrocco's tax returns, despite the fact that summary judgment had been reversed in part based on Marrocco's affidavit testimony about the origin of the seized funds. In a case that was at that point 11 years old, the government's failure to move expeditiously to reopen discovery also warrants denial of its motion to reopen discovery. Accordingly, the motion for production of additional tax returns is denied.

\* \* \*

Based on the foregoing, Claimants' Motion for a *Daubert* Hearing [240] is denied as moot; Claimants' Motion in Limine to Exclude Evidence Pursuant to Rule 403 or Due to Spoliation [242] is denied; Claimants' Motion to Suppress Statements [244] is granted; the United States' Motion to Strike Expert Witnesses [246] is granted

in part and denied in part; and the United States' Motion for Production of Tax Returns [248] is denied. The Court would also be remiss if it did not remark, in closing, that the myriad mischaracterizations and misstatements by the government's counsel in this case are unacceptable for any attorneys, much less those representing the United States. Going forward, the Court expects from counsel far greater fidelity and attention to both the record in this case and to the rulings of the Seventh Circuit and this Court.

## ORDER ON RECONSIDERATION

For the reasons set forth below, Plaintiff's motion to reconsider [266] is denied. A status hearing is set for August 18, 2015, at 9:00 a.m.

### STATEMENT

The United States has asked the Court to reconsider two aspects of the order entered on February 11, 2015 (the "February 11 Order"): (1) the ruling barring the government from presenting expert testimony to establish that the science behind the admissibility of dog-sniff evidence is sound, and (2) the ruling barring the introduction of statements made by claimant Vincent Fallon in the Amtrak station police office.[1] The government's arguments

---

**1.** The government also takes issue with statements in the February 11 Order indicating that the government's failure to preserve the currency seized in this case was improper. *See* Dkt. 267, at 2 n.1. Although it has not sought reconsideration of that part of the order, for the record the government has submitted copies of written policies of the Department of Justice governing the disposition of seized cash, specifically the department's "Seized Cash" policy and the "Seized Cash Management" section of the department's Asset Forfeiture Policy Manual. Exs. A and B, Dkt. 267–1. It is unclear whether these policies were in effect at the relevant time in this case, since the former was issued in 1987 and superseded at some later (unspecified) date, while the latter dates from 2013. In any event, the government contends that in depositing the cash seized in this case, it complied

with these policies. Neither of the policies, however, purports to authorize the deposit of cash that has independent evidentiary value— as did the cash seized in this case. *See, e.g.,* Ex. A, Dkt. 267–1, at 2 ("Retention of currency *will be permitted* when retention of that currency, or a portion thereof, serves *a significant independent, tangible, evidentiary purpose* due to, for example, the presence of fingerprints, packaging in an incriminating fashion, *or the existence of a traceable amount of narcotic residue on the bills.*" (emphases added)); Ex. B, Dkt. 267–1, at 41 ("The Attorney General has established the following policy on the handling of seized cash: "Seized cash, *except where it is to be used as evidence*, is to be deposited promptly in the Seized Asset Deposit Fund pending forfeiture." (emphasis added) (footnote omitted)). And to the extent that the government

in support of these requests, however, rely on only portions of the record and ignore other, more salient, developments over the case's lengthy history. Viewed in the context of the full record, the government's arguments are unpersuasive.

### 1. *The government's failure to disclose an expert regarding the scientific reliability of drug-detection dog alerts on currency*

The currency at issue in this action was seized after, among other events, a drug-detection dog (named "Deny") alerted to a briefcase containing the currency. The government maintains that the Court erred when it concluded that the government had not designated an expert to testify in support of the scientific basis to infer from Deny's alert that the currency had been recently exposed to illegal drugs. The government represents that, to the contrary, it "retained and designated" an expert to testify in this matter back in 2004. Dkt. 267, at 5. And, indeed, there is evidence to support that claim. The government listed Dr. Stefan Rose as an expert witness in a pretrial order it submitted in April 2004 and disclosed a report to the claimants.[2] The claimants objected to

Dr. Rose's disclosure as untimely, and to the substance of his testimony as unreliable, and sought a *Daubert* hearing. Dkts. 34, 40. This dispute was never resolved, however, because Judge Bucklo (who was then presiding in this case) granted the claimants' motion to suppress the seized currency, thereby mooting (for a while, anyway) the need for any testimony about dog-sniff evidence. *See* Dkt. 51.

So far as the record reflects, the unresolved attempt to designate Dr. Rose as an expert for the government in 2004 was the first, and only, time (until the filing of the motion under consideration, *see* Dkt. 267, at 7) that the government disclosed any intention to call Dr. Rose as an expert in this case.[3] And the record amply supports the claimants' assertion that until the government's recent indication of a desire to use Dr. Rose, the government had affirmatively abandoned any intention to designate Dr. Rose, or any other expert witness, to support the admissibility of the dog-sniff evidence because it believed that the Seventh Circuit's ruling in *United States v. $30,670*, 403 F.3d 448 (7th Cir. 2005), obviated the need to present expert evidence to support the reliability of such evidence.

is suggesting that department policy could legitimize the destruction of material evidence, that suggestion is of course unfounded.

**2.** The government's contention that the draft pretrial order that it submitted, which Judge Bucklo never entered, is "still applicable," Dkt. 267, at 7, is untenable. No pretrial order was ever entered; the draft order submitted by the government was thus never "applicable."

**3.** The government notes that it later attached (in its reply brief on its second summary judgment motion, Dkt. 187) an affidavit provided by Dr. Rose in a different case. Dkt. 267, at 6. That action, however, only reinforced the impression that the government did not intend to use Rose an expert in *this* case. The government also attached similar

materials with respect to Dr. Furton to its reply brief, and argued that the work of both experts provided the foundation for the Seventh Circuit's decision in *United States v. $30,670*, 403 F.3d 448 (7th Cir.2005), which the government believed "[p]ut an [e]nd to" the contaminated money theory. Dkt. 187, at 3. The government's point in including information about the work of Drs. Furton and Rose was to support its argument that the claimants' experts should not be permitted because the scientific reliability of dog alerts on currency had already been definitively decided by the Seventh Circuit. Nowhere did the government suggest that it had retained either Dr. Rose or Dr. Furton, and the entire point of its argument was that *it did not need to retain any experts* because the Seventh Circuit had resolved the issue in *$30,670*. *See* Dkt. 187, at 2–4.

The government's motion omits this part of the story, but the Court will not. The claimants filed their motion to suppress the seizure of the funds in April 2004. Dkt. 39. In response to that motion, Judge Bucklo vacated the trial date of April 26, 2004, and instead held a hearing on the motion to suppress the seized funds. Dkts. 42–44. In March 2005, Judge Bucklo granted the motion to suppress and denied the motions the claimants had filed challenging the government's designation of Dr. Rose as an expert witness as moot. Dkt. 51. The government's motion to reconsider was denied in September 2006. Dkt. 86. Over the course of the next ten months, the parties contested the claimants' motion to obtain the seized funds; Judge Bucklo ultimately ruled that claimant Nicholas Marrocco was the lawful owner of the funds and entered judgment in July 2007. Dkt. 110. The government appealed, the judgment was vacated, *see United States v. Marrocco (Funds I )*, 578 F.3d 627 (7th Cir.2009), and the case was remanded for further proceedings in October 2009. Dkt. 136.

In the meantime, the Seventh Circuit decided *$30,670*, holding that "the empirical information provided in this case indicates that dog alerts to currency should be entitled to probative weight." 403 F.3d at 460. Seizing on that ruling following remand in this case, the government changed its course with respect to the evidence necessary to establish the reliability of Deny's alert on the seized funds. Whereas the government had originally intended to present expert testimony from Dr. Rose at trial to establish "that a positive alert to U.S. currency by a properly trained narcotics detection canine indicates that the currency had recently . . . been in close or actual proximity to a significant amount of narcotics, and is not the result of any alleged innocent environmental contamination of circulated U.S. currency by microscopic traces of cocaine," Dkt. 37, at

5, after remand the government immediately moved for summary judgment, Dkt. 144. The government's filings in support of its summary judgment motion did not cite or rely on any affidavit or report from Dr. Rose or any other expert to establish the reliability of the "science" behind dog alerts on currency; rather, the government took the position that the positive alert by a "[t]rained and [r]eliable" drug-detection dog was sufficient, in conjunction with the other evidence presented, to prove that the funds were related to illegal drug trafficking, Dkt. 145, at 10, and presented an affidavit from Officer Richard King, Deny's handler, averring (among other things) that Deny "is trained to alert to the presence of the odor of illegal drugs" and "alerted to the presence of the odor of an illegal drug coming from the briefcase containing the seized currency," Ex. K, Dkt. 146–4, ¶¶ 6, 21. The government subsequently withdrew this summary judgment motion with leave to refile it, Dkt. 49, and the claimants filed new motions targeting not Dr. Rose, but Officer King, the government's newly proposed and putatively "non-expert" witness, Dkts. 150, 154.

In response to the claimants' motion for a *Daubert* hearing with respect to Officer King, the government expressly averred that it intended to rely on "evidence, through the testimony of the dog handler, and documents, about the dog's training, certification, history, past performance, reliability, and the alert to the money in this case." Dkt. 158, at 1–2. The government argued that a *Daubert* hearing was an improper vehicle for challenging dog alert evidence and that, on the strength of the Seventh Circuit's opinion in *$30,670*, the scientific reliability of dog-sniff evidence had already been established. Dkt. 158, at 3. "In sum," the government maintained, "Officer King's personal knowledge, combined with Deny's performance record, es-

tablishes Deny's reliability *without use of scientific knowledge*." Dkt. 158, at 4 (emphasis added). In other words, the government represented that it had no intention of calling any experts to establish the scientific reliability of Deny's alert on the funds; that issue, it maintained, had been definitively resolved by *$30,670*.

As previously recounted in the February 11 Order, Judge Bucklo denied the claimants' challenge to Officer King's testimony, expressly agreeing with the government's argument that *$30,670* had obviated the need for scientific testimony to establish the reliability of dog-sniff evidence and stating that it was unnecessary for the government "to reinvent the wheel" on that score. Dkt. 166.

Thereafter, in July 2010, the government renewed its summary judgment motion, Dkt. 169, and in support of that motion again asserted that evidence of Deny's performance and training was sufficient to establish the reliability of his alert on the seized currency. *See* Dkt. 170, at 7–8, 12–13; *see also* Dkt. 187, at 2–4 (stating that the Seventh Circuit "[p]ut an [e]nd to" the innocently contaminated money theory in *$30,670* ). In response, the claimants included affidavits from two experts, David Kroyer and Sanford Angelos, in an effort to challenge the reliability of the dog-alert evidence. *See* Dkt. 175–1, at 6–7; Ex. 1, Dkt. 175–3; Ex. 2, Dkt. 175–4. The government moved to strike the experts as undisclosed and in so responding affirmed that "[t]he United States moved for summary judgment *without any expert testimony*." Dkt. 180, at 5 (emphasis added). The government also argued that it would be prejudiced if the claimants were permitted to rely on this expert evidence because it would need to "review, research, identify and retain expert witnesses" on these subjects. Dkt. 180, at 5. Plainly, the government did not regard Dr. Rose as its retained witness at this juncture.

Neither did the court. Judge Bucklo resolved this dispute by ruling that she would first evaluate the government's summary judgment motion without reference to the dog-alert evidence, and would consider that evidence only if the summary judgment motion was otherwise insufficient:

> The government notes *that it could not find its own expert* in the time in which it needs to respond to the motion for summary judgment. While I will not strike the affidavits [of the claimants' experts], I will not consider them, nor will I consider the government's second ground for summary judgment [which relies on the dog-alert evidence]. The government shall file its reply, on time. I will consider whether the government is entitled to summary judgment without reliance on the dog sniff. If I conclude that it is necessary, I will give the government time *to obtain its own expert* and to file a new motion for summary judgment. I will also consider appropriate Daubert challenges.

Dkt. 183 (emphases added). Judge Bucklo denied this second motion for summary judgment in March 2011. True to her word, however, she gave the government leave "to file a renewed motion supported by expert evidence relating to the dog sniff, as well as any appropriate Daubert challenges to claimants' expert evidence." Dkt. 191.

In May 2011, the government filed its renewed (third) summary judgment motion. Dkt. 198. Notwithstanding its prior representation to Judge Bucklo that it needed time to "review, research, identify and retain expert witnesses" on the science of dog alerts on currency, Dkt. 180, at 5, the government presented no such evidence in its renewed motion. Instead, the government again took the position that "[e]xpert testimony is not needed" to establish the reliability of dog-alert evidence. Dkt. 199, at 8; *see also United States v.*

*Funds in the Amount of One Hundred Thousand One Hundred & Twenty Dollars (Funds II )*, 730 F.3d 711, 715 (7th Cir.2013) ("Despite the district court's earlier admonishment, the government did not provide expert evidence in its [third] motion for summary judgment, but argued instead that such evidence was unnecessary to establish that a particular drug dog was reliable or that a particular sniff was sound."). Maintaining its position that *$30,670* foreclosed any challenge to the scientific reliability of such evidence, *see* Dkt. 199, at 10 (asserting that the claimants "lost on the innocent contaminated money theory" by virtue of the opinion in *$30,670* ), the government again relied solely on Officer King's affidavit and Deny's training records to establish the probative value of Deny's alert on the seized currency. In reply to the claimants' response arguing that it had failed to present expert testimony to support the probative worth of the dog-sniff evidence, the government reiterated these points. *See* Dkt. 216, at 4 ("[e]xpert testimony is not needed to support a proper methodology").[4]

In light of this record, there is simply no doubt that the government abandoned any intention of calling an expert witness regarding the scientific foundation for dog-alerts on currency in the wake of the Seventh Circuit's ruling in *$30,670*. And prior to the Seventh Circuit's ruling in *Funds II*, that may not have been an unreasonable approach to take. But as discussed in the February 11 Order, in

*Funds II* the Seventh Circuit expressly rejected the government's interpretation of *$30,670* and held that challenges to the scientific foundation for the admissibility of dog-alert evidence were not foreclosed. The *Funds II* panel explained that the holding in *$30,670* was based solely on the empirical information presented in that case and held that the admissibility of expert evidence supporting or challenging the scientific reliability of a drug detection dog's alert is subject to *Daubert* analysis. *Funds II*, 730 F.3d at 720–21 & n. 13. After *Funds II*, it was clear that the scientific reliability of dog-alert evidence is subject to challenge through expert testimony.

Nevertheless, the government's position as to the need for expert testimony did not change. Following remand after *Funds II*, at a status hearing on August 5, 2014, this Court set a deadline of November 5, 2014, for the filing of any further pretrial motions (other than motions in limine). Dkt. 239. In response, the government did not file any motion seeking to designate Dr. Rose, or any other expert, to testify in support of the scientific foundation for the probative value of Deny's alert or to challenge the experts disclosed by the claimants; it maintained its position that Officer King's testimony, and related evidence concerning Deny's training and performance, was sufficient to establish that Deny's alert was evidence that the seized funds had recently been in the vicinity of illegal drugs. *See, e.g.,* Dkt. 251, at 5–7 (responding to claimants' *Daubert* objections to Officer King's testimony).[5] In-

---

4. As explained in the February 11 Order, Judge Bucklo granted the government's third summary judgment motion. That ruling was ultimately reversed, however, in *Funds II*.

5. In support of its motion for reconsideration, the government asserts that it did not take the position after *Funds II* that the general reliability of dog sniff evidence cannot be challenged. *See* Dkt. 267, at 4. That assertion is

entirely unconvincing, for all of the reasons set forth in the February 11 Order. A single passage from the government's response to the claimants' *Daubert* objections to Officer King's testimony, however, suffices to show why the government's purported fealty to the *Funds II* opinion is empty. Explaining why no *Daubert* hearing was necessary, the government plainly asserted that the holding in

deed, the government's response to the claimant's *Daubert* motion regarding Officer King did not challenge the claimants' statement (Dkt.240, ¶ 11) that the government had not designated an expert witness in support of its theory of the case besides Officer King.

It was only after the Court issued the February 11 Order that the government reasserted an intention to use Dr. Rose as an expert in this case. Two aspects of the February 11 Order may account for this change of heart. First, the Court held that while Officer King could testify about Deny's performance during training and in the field, he could not offer opinion testimony that Deny was alerting to the odor of illegal drugs on the currency. Dkt. 261, at 7. That ruling—which the government has not challenged—left the government without a witness to offer an opinion as to the meaning of Deny's alert. And second, the Court held that the claimants would be permitted to offer opinion testimony from a new expert, Dr. Warren James Woodford, a forensic chemist "working in the field of odor science," in place of the testimony of Sanford Angelos, who passed away. Dkt. 261, at 11–12. The Court indicated, however, that "to the extent that the government can demonstrate that Dr. Woodford's opinions extend materially beyond the scope of the opinions of Angelos, the government will be permitted an opportunity to offer a rebuttal expert." Dkt. 261, at 12.

Neither of these rulings supports the government's request to offer opinion testimony by Dr. Rose. With respect to the testimony of Officer King, the government has, since at least May 2010, always conceded that King is not an expert and that

his "personal knowledge, combined with Deny's performance record, establishes Deny's reliability *without use of scientific knowledge*." Dkt. 158, at 4 (emphasis added). Moreover, the claimants have been seeking to exclude Officer King's testimony about the meaning of Deny's alert for just as long; the Daubert motion filed by claimants in April 2010 expressly challenged his ability to offer opinion testimony about the meaning of Deny's alert, stating:

13. That obviously, Deny, being a canine, is incompetent to testify. Therefore, the government provided an affidavit from the dog's handler, Officer King, attesting to his opinion of Deny's reaction to the briefcase.

14. The affidavit further avers Officer King's opinion testimony of his interpretation of Deny's reaction.

15. That finally, the affidavit avers Officer King's opinion testimony of his interpretation of Deny's purported reliability.

16. That the government did not provide any evidence that Officer King was an expert in canine olfaction, scientific statistical analysis, or the chemical composition of any illegal narcotics allegedly contaminating the briefcase.

\* \* \* \* \*

26. That Officer King's affidavit does not cite any scientific work experience in the training or evaluation of dogs for detection of narcotics on U.S. currency.

\* \* \* \* \*

31. Therefore, this Court should grant Claimants' motion for a *Daubert* hearing

---

*$30,670* foreclosed any challenge to the scientific reliability of drug dog alerts:

> Courts have universally ... [found] that the dog's performance establishes the dog's reliability. In addition, *our court of appeals*

*has directly reviewed the scientific data behind the utility of drug dogs, and its adoption of the science and approval of the dog's use obviates the need for a hearing.* Dkt. 251, at 1 (emphasis added).

prior to allowing Officer King to testify regarding the alleged dog sniff.

Dkt. 150.

The claimants' *Daubert* motion filed in October 2014 was little changed:

10. It is expected that Plaintiff will offer the testimony of Handler Richard King and his speculation about Deny's behavior on or about December 6, 2002. . . .

11. Plaintiff has not designated an additional expert to testify to their theory of the case, *i.e.*, that a positive dog alert to currency is probative of whether the currency was recently in contact with narcotics. . . .

\* \* \* \* \*

24. Plaintiff nevertheless claims, Officer King's interpretation of the sniffer dog's purported alert "establishes that the source of the funds was from illegal drug transactions."

\* \* \* \* \*

34. [T]he government has not produced any evidence that Officer King has any scientific training or experience on the ability and effectiveness of dogs to identify narcotics on U.S. Currency.

\* \* \* \* \*

39. Therefore, this Court should grant Claimants' motion for a *Daubert* hearing prior to allowing Officer King to testify regarding the alleged dog sniff and require Plaintiff to prove that its theory relating to the probative value of the dog sniff survives *Daubert*.

Dkt. 240. In light of the claimants' prior *Daubert* motion and the *Funds II* ruling, it should not have come as news to the government that Officer King, a non-scientist, would be subject to this renewed *Daubert* motion and might be barred from offering opinion testimony predicated on the science behind dog-sniff evidence. Nevertheless, in response to the claimants' October 2014 *Daubert* motion the government did not contend that it had an expert in hand to testify about the science behind dog-

sniff evidence, or even that it needed an opportunity to "review, research, identify and retain expert witnesses," as it had argued in response to essentially the same *Daubert* motion when it had been filed almost five years earlier. Instead, the government simply persisted in its position that "Officer King's testimony does not rely on scientific knowledge," and that "the science behind the admissibility of dog sniff evidence has been found reliable." Dkt. 251, at 6 (citing *$30,670*, 403 F.3d at 462). The Court will not relieve the government of the predictable consequence of its failure to acknowledge the holding of *Funds II* by allowing it to call in a scientist to supply scientific opinion testimony that Officer King has now been barred from providing.

Nor will the Court permit the government to present opinion testimony from Dr. Rose under the guise of rebuttal to Dr. Woodford's opinions. The government acknowledges that it was only after Dr. Woodford's deposition on April 21, 2015, that it "determined that it would be helpful to present Dr. Rose's testimony at trial." Dkt. 267, at 7. Apart from the fact that this statement concedes that, before Dr. Woodford's deposition, the government did not regard Dr. Rose as an expert in this case and had no intention of calling him, the government's belief that Dr. Rose's testimony would be "helpful" does not warrant permitting the government to designate him as a witness at this late juncture. In the February 11 Order, the Court stated that the government would be permitted to offer a rebuttal expert only "to the extent that the government can demonstrate that Dr. Woodford's opinions extend materially beyond the scope of the opinions" previously offered by Angelos. Dkt. 261, at 12. The government has not even attempted to make such a showing. It offers no description of the "helpful" testimony Dr. Rose might offer, much less an

explanation of how Dr. Woodford's opinions differ from those of Angelos or why the government did not realize years ago that Dr. Rose's testimony would be "helpful." The government's belated realization that offering scientific evidence in this case might be "helpful" does not begin to justify its prior failure to acknowledge the utility of an expert in this area or the further costs that would attend the introduction of a new, or even recycled, expert.

In short: The government abandoned its original plan to call Dr. Rose as a trial witness long ago, preferring to rely on Officer King's testimony. It has also failed to make the showing required to use Dr. Rose as a rebuttal witness to Dr. Woodford. Accordingly, Dr. Rose will not be permitted to testify.

### 2. The suppression of Fallon's statements

The government also requests reconsideration of the Court's determination that Judge Bucklo's ruling barring use of Fallon's statements in the Amtrak police office is law of the case.[6] The government characterizes Judge Bucklo's ruling, as well as her subsequent reaffirmation of that ruling, as mere "dicta." That claim is simply wrong. Judge Bucklo did not merely offer an observation that the statements might, or could be, inadmissible based on *Miranda* violations—she **ruled** that the statements could not be admitted as evidence:

> The government also references the inconsistent answers provided by Mr. Fallon in response to questioning at the Amtrak police station. However, by the time Mr. Fallon was being questioned, he was in a custodial setting—he had been fingerprinted, frisked twice, and photographed. He was also placed in a room to which the public did not have access, and his briefcase had been removed from his physical possession. Despite all this, *no one read Mr. Fallon his Miranda rights.* The government may not rely on these statements to support a finding of probable cause.

Dkt. 52, at 10 n.1 (citation omitted).[7] This passage makes plain both that the government relied in part on statements Fallon made in the Amtrak police station to support its argument in opposition to the claimants' motion to suppress the seizure of the funds and that, in granting the motion to suppress, Judge Bucklo held that the government could not rely on those statements because Fallon had not been advised of his *Miranda* rights. Contrary to the government's arguments, this ruling was in no way gratuitous or unnecessary to the Court's decision; it was an essential part of the Court's rationale for granting the motion to suppress the seizure of the funds. Accordingly, this ruling was not dicta. *See, e.g., Vidimos, Inc. v. Wysong Laser Co.,* 179 F.3d 1063, 1065 (7th Cir.1999) (stating that court's discussion of issue that provided a partial ground for its opinion was not dictum).

The government's claim that the ruling precluding use of Fallon's statements was dicta is also undermined by the arguments it made in its motion to reconsider the

---

6. As explained in the Court's February 11 Order, Judge Bucklo's ruling suppressing Fallon's statements was incorrect, since statements obtained without *Miranda* warnings are admissible in civil cases, including civil forfeiture actions. The Court nevertheless granted the claimants' motion to suppress the statements, based on waiver and law of the case doctrines.

7. That the ruling excluding Fallon's custodial statements was set forth in a footnote is of no consequence. *See, e.g., Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 64, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (expressly acknowledging import of a holding set forth by a district court, "albeit in a footnote").

grant of the motion to suppress the seizure of the funds. There, the government expressly acknowledged that the court "also *ruled* that statements made in the Amtrak police office were not admissible because they were made without providing *Miranda* warnings.... The court found that Fallon was in a custodial setting and *the United States cannot rely on his statements there to prove its case.*" Dkt. 56, at 11 (emphases added) (citing Dkt. 52, at 10 n.1). The government devoted two full pages to arguing that this ruling was erroneous because the court's factual finding that Fallon was in custody was not supported by the record. *See* Dkt. 56, at 11–12. Not once, however, did the government suggest that the ruling was merely dicta, or that the court had reached the issue without adequate briefing from the parties. To the contrary, the government's motion appropriately treated the court's statements on the issue as an order by the court that precluded the use of what the court considered to have been evidence that had been unlawfully obtained.

■ Although Judge Bucklo's ruling on the admissibility of Fallon's custodial statements was not dicta, it was interlocutory, meaning that the government could not simply appeal that ruling. But, as noted in the Court's February 11 Order, interlocutory rulings become appealable when a final judgment issues. Judge Bucklo issued a final judgment in this case following her determination that claimant Marrocco was entitled to ownership of the funds, Dkt. 110, and the government appealed that judgment, Dkt. 116. Judge Bucklo's ruling on the suppression motion was relevant to the appeal because it suppressed evidence on which the government had relied to establish a link between the seized funds and illegal drug trafficking. Nevertheless, the government did not reassert on appeal its arguments for reconsideration of the ruling precluding use

of Fallon's statements; that failure to advance an argument that the district court erred in excluding Fallon's custodial statements waived the argument. *see Hojnacki v. Klein–Acosta,* 285 F.3d 544, 549 (7th Cir.2002). The ruling precluding use of the statements therefore became law of the case. *see United States v. Black,* 625 F.3d 386, 389 (7th Cir.2010) (indicating that portion of opinion not disturbed on appeal becomes law of the case). "[A] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." *Williamsburg Wax Museum v. Historic Figures, Inc.,* 810 F.2d 243, 250 (D.C.Cir. 1987). That describes the situation the government faces with respect to the exclusion of Fallon's custodial statements perfectly.

The government's failure to appeal Judge Bucklo's ruling regarding Fallon's statements, moreover, was not a mistake; it was a knowing decision—*i.e.,* a waiver. As noted above, following remand after *Funds I* the government immediately filed a summary judgment motion; the claimants then filed a bevy of pretrial motions in limine, including a motion in limine to bar use of Fallon's custodial statements on the basis that the court's earlier ruling, coupled with the government's failure to appeal, made the ruling law of the case. Dkt. 152, ¶¶ 4–7. In response, the government acknowledged that it was not challenging Judge Bucklo's ruling on the admissibility of Fallon's statements:

*The court has ruled, albeit in a footnote,* that while in the police office Fallon was in custody and therefore without Miranda any statements made their [sic] cannot by [sic] used to find probable cause. *While the United States may*

*not choose to challenge that ruling at this time*, it does wish to make clear its position that subsequent statements made knowingly and voluntarily, even if relating to the same subject or the earlier statement itself, is [sic] not excludable from these proceedings.

Dkt. 156, at 2 (emphases added). Nowhere in its present motion to reconsider the February 11 Order does the government even mention this express disclaimer of any challenge to Judge Bucklo's ruling precluding use of Fallon's custodial statements, much less explain why what the government then characterized as the court's "ruling" should now be considered mere "dicta."

Although Judge Bucklo initially issued a docket entry (Dkt.165) on May 26, 2010, denying the motion in limine to bar use of Fallon's custodial statements, a week later she entered an order (Dkt.167) correcting the May 26 docket entry to state that the motion in limine was "reserved for consideration" with the third motion for summary judgment.[8] In her eventual memorandum opinion on that summary judgment motion, Judge Bucklo reaffirmed her prior ruling that the government

could not rely on Fallon's custodial statements, thus implicitly granting the claimants' motion in limine regarding those statements. *See* Dkt. 219, at 7 n.5. As recounted in this Court's February 11 Order, the government, however, badly misstated the record by declaring that Judge Bucklo had denied the claimants' motion in limine.[9] More germane to the present discussion, however, is that the government also argued that the supposed denial of the claimant's motion in limine constituted law of the case:

> Claimant's motion to exclude custodial statements has already been presented to the court in this case and denied. Under the doctrine of law-of-the-case, it should remain denied.
>
> The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."

Dkt. 253, at 3 (citations omitted). In other words, on December 3, 2014 (the date the government filed its opposition to the claimants' most recent motion to bar use of the statements), the government argued that Judge Bucklo's ruling that Fallon's

---

8. The docket entry reserving the motion for consideration does not, as the government asserts, *see* Dkt. 267, at 9, amount to an implicit statement that the prior exclusion of Fallon's statements was not the law of the case; it was simply a statement that the court was not addressing the motion at that time. The government's continued efforts to characterize Judge Bucklo's actions regarding the claimants' motion in limine as an endorsement of the government's arguments remain, in the Court's view, unsupportable. Judge Bucklo did not accept the government's position with respect to Fallon's custodial statements—period.

9. This error was not, as the government paints it in its motion to reconsider the February 11 Order, *see* Dkt. 267, at 10, simply the result of overlooking a single order in the course of a case with a ten-year history.

Rather it was the failure to consider: (1) Judge Bucklo's original ruling in March 2005 that the government could not rely on Fallon's custodial statements, Dkt. 52, at 10 n.1; (2) the government's April 2005 motion to reconsider that order, which acknowledged that the court had ruled that Fallon's statements were inadmissible, Dkt. 56, at 11; (3) the government's May 2010 response to the claimants' motion in limine to exclude the statements, which again acknowledged that ruling, Dkt. 156, at 2; (4) Judge Bucklo's June 2010 order correcting her recent minute entry to reflect that the motion in limine was taken under advisement rather than denied, Dkt. 167; *and* (5) Judge Bucklo's October 2011 memorandum opinion which reaffirmed her original ruling excluding the statements and implicitly granted the motion in limine, Dkt. 219, at 7 n.5.

statements would not be excluded—a ruling that she never made—was "law of the case." Yet the government now takes the position that Judge Bucklo's ruling that Fallon's statements *would* be excluded—a ruling that she actually made and subsequently reaffirmed—is not. The Court is at a loss to understand how the government can rationalize these inconsistent positions—and notably, the government has not even attempted to do so.

Judge Bucklo's reaffirmation of her original ruling excluding Fallon's statements appeared in a memorandum opinion addressing the government's third motion for summary judgment. In that opinion, Judge Bucklo acknowledged that Fallon's suspicious travel arrangements were consistent with the drug courier profile, and that this profile, combined with Fallon's conflicting responses when questioned about the briefcase's contents, warranted a reasonable suspicion that the briefcase contained contraband. Dkt. 219, at 7. Judge Bucklo confirmed, however, that Fallon's custodial statements were not part of her calculus regarding the government's claim of forfeiture because she had previously ruled that the "government may not rely on Mr. Fallon's post-custody, *non-Mirandized* statements." Dkt. 219, at 7 n.5. Her citation to her prior ruling, moreover, noted that the Seventh Circuit had reversed the judgment "on other grounds," Dkt. 219, at 7 n.5, meaning that her ruling excluding Fallon's custodial statements had not been disturbed on appeal—in other words, that i was law of the case.

■ The government takes issue with the Court's statement that it should have cross-appealed Judge Bucklo's reaffirmation of her ruling excluding Fallon's statements when the claimants appealed the grant of summary judgment in the government's favor. The government maintains that it could not have cross-appealed that aspect of Judge Bucklo's ruling, but it is

not necessary to resolve that question because the government had already waived the right to challenge the suppression of Fallon's custodial statements years earlier by failing to challenge that ruling in the *Funds I* appeal. As discussed above, that made the ruling suppressing the statements became law of the case following *Funds I* and, accordingly, the question of a cross-appeal in *Funds II* is essentially irrelevant. The Court's discussion of that subject in the February 11 Order unnecessarily complicated the analysis; failure to cross-appeal or no, Judge Bucklo's ruling suppressing Fallon's custodial statements is law of the case.

Date: July 27, 2015